UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:07-CR-6-FL-1

UNITED STATES OF AMERICA    )
    )
v.    )    **MEMORANDUM AND**
    )    **RECOMMENDATION**
DEONTRAYVIA ADAMS,    )
    )
    Defendant.    )

This case comes before the court on defendant's motion to suppress (D.E. 16). The motion was referred to the undersigned for an evidentiary hearing and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 71). In support of his motion, defendant has filed two memoranda, one included in his motion (D.E. 16) and a supplemental memorandum (D.E. 91). The government filed a memorandum (D.E. 79) and a supplemental memorandum (D.E. 94) in opposition. For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

On 3 January 2007, defendant was indicted (D.E. 1) on charges of possession of a firearm (*i.e.*, a nine millimeter semi-automatic pistol) and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924, and possession of a quantity of marijuana in violation of 21 U.S.C. § 844(a). On 27 February 2007, 11 days after the deadline for filing pretrial motions, which had previously been extended on defendant's motion (*see* D.E. 13), defendant filed the instant motion to suppress along with a motion for leave to file the suppression motion (D.E. 15). The suppression motion sought suppression of all evidence taken during and derivative from a traffic stop that led to the charges against defendant, including the statements made by defendant to police after his arrest.

On 8 March 2007, the court denied defendant's motion for leave to file and ordered the Clerk to strike the suppression motion. (*See* D.E. 18).

On 3 July 2007, defendant was convicted by a jury on both counts of the indictment. (*See* D.E. 55). On 16 October 2007, the defendant was sentenced (*see* D.E. 62), and a judgment was entered against him (D.E. 63). On 17 October 2007, defendant filed an appeal from his conviction.[1] (*See* D.E. 57). On 14 May 2010, the United States Court of Appeals for the Fourth Circuit ordered a limited remand for an evidentiary hearing and ruling on the motion to suppress. (*See* D.E. 70). On 24 May 2010, defendant's motion to suppress was referred to the undersigned.

On 21 July 2010, an evidentiary hearing was conducted before the undersigned. (D.E. 82). At the hearing, the government presented the testimony[2] of J.S. McCann, Christopher Clark, and Craig Haines, who were each serving with the Raleigh Police Department ("RPD") at the time of defendant's arrest, McCann and Clark as officers and Haines as a sergeant (now a lieutenant). (Transcript of Hearing ("Tr.") (D.E. 85) 8:7; 59:10 to 60:1; 109:15-22). The court admitted the three exhibits offered by the government without objection by defendant, as follows: a map of the area of Raleigh, North Carolina where the traffic stop occurred (Gov.'s Hrg. Ex. 1); a copy of the RPD *Miranda*[3] form presented to defendant but not signed (Gov.'s Hrg. Ex. 2); and a copy of Haines' notes from his interview with defendant (Gov.'s Hrg. Ex. 3).

---

[1] Defendant was assigned new counsel for his appeal and that counsel is representing him on his motion to suppress.

[2] Pursuant to the court's order (D.E. 81), all witnesses were in the courtroom only during their own testimony.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

Defendant presented the testimony of Catherine Flowers, a licensed private investigator and former officer with the RPD. (Tr. 140:20-21, 141:12-14). Defendant also introduced 26 exhibits without objection: excerpts from the transcript of defendant's trial (Def.'s Hrg. Exs. 21, 22); photographs of the vehicle defendant was driving at the time of the stop (Def.'s Hrg. Exs. 1-8, 34-37); a street map of the area of the stop (Def.'s Hrg. Ex. 10); three copies of an aerial view of the area of the stop[4] (Def.'s Hrg. Exs. 25a, 25b, 25c); a criminal history report for defendant showing a window tinting violation on 4 July 2005 (Def.'s Hrg. Exs. 39, 40); a signed statement of the current owner of the vehicle that no changes were made after the date of purchase (Def.'s Hrg. Ex. 38); photographs of a vehicle taken in the stop area by Flowers during her investigation (Def.'s Hrg. Exs. 29-33); a video taken by Flowers of an attempted simulation of the events of the night in question, portions of which were shown at the hearing (Def.'s Hrg. Ex. 42a); and a copy of an inmate tracking report for defendant (Def.'s Hrg. Ex. 41).[5]

At the conclusion of the hearing, the court granted defendant leave to file an edited version of the video presented at the hearing to remove portions that defendant did not intend to offer as evidence. This edited version (Def.'s Hrg. Ex. 42b) was submitted to the court on 29 July 2010 and accepted into evidence. (*See* Am. Ex. List (D.E. 95)).

---

[4] Multiple copies of this aerial view were used at the hearing because certain witnesses made notations on the particular copy presented to them. There was a need to avoid confusion among the markings of different witnesses and to be able to present witnesses at the outset of their testimony with a clean copy of the aerial view.

[5] When, as here, the court is determining preliminary questions concerning the admissibility of evidence, it is not bound by the Federal Rules of Evidence, except those with respect to privilege. *See* Fed. R. Evid. 104(a); *see also United States v. Matlock*, 415 U.S. 164, 172 (1974) (holding that "the rules of evidence normally applicable in criminal trials do not operate with full force at [suppression] hearings before the judge to determine the admissibility of evidence"); Fed. R. Evid. 1101(d)(1). Nevertheless, even where not directly applicable, the court has relied on the Federal Rules of Evidence and the principles underlying them as guides in evaluating the evidence in this matter.

3

The court also, as indicated, allowed the parties to file supplemental memoranda, which they did.[6] With its supplemental memorandum, the government filed three evidentiary exhibits: a declaration by a purported expert on photography regarding the video and photographic evidence developed by Flowers (D.E. 94-1); a document the government's counsel represents to be a medical record of Clark relating to his eyesight (D.E. 94-2); and a declaration by a Raleigh city engineer regarding the status as public streets of various roadways at issue (D.E. 94-3). The government did not move for leave to keep the evidentiary record open at the end of the hearing and did not move at the time of filing the supplemental exhibits for leave to do so out of time. It has not otherwise justified why the record should be opened to permit this additional evidence. The evidence would add little of substance to the information already included in the record[7] and would in any event to be entitled to diminished weight because it was not subjected to cross-examination. Nevertheless, to avoid any possible prejudice to defendant arising from the government's tardy exhibits, the court has not considered them in its evaluation of defendant's motion, and they should be stricken.

Because a key issue raised at the hearing involved the amount of light present in the area of the traffic stop, on 23 July 2010, the court entered a notice of intent to take judicial notice (D.E. 84) of the information from the U.S. Naval Observatory in the notice relating to the phase of the moon

---

[6] The memoranda obviated oral argument on the motion, which the court at the time of the hearing had anticipated would be necessary.

[7] For example, although the declaration regarding the video and photographic evidence from Flowers makes the point that cameras do not record images at night as the human eye perceives them, the court was able to determine from its own review of this evidence that it portrays the nighttime as darker than it naturally appears, as discussed below. The formally unauthenticated medical record seeks to make the point that Clark has good eyesight. That attribute, however, is to some degree implicit in his being a pilot, a fact established by other portions of the record. The declaration regarding the public nature of certain streets appears to be superfluous because the record does not show a dispute between the parties regarding the public nature of the streets in question. The non-consideration of these exhibits therefore does not appear to materially prejudice the government.

4

on both the night of the challenged traffic stop and the night of Flowers' attempted simulation. Neither party objected to the court's taking judicial notice of this information, and the court hereby does so.

## FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court makes the following findings of fact:

## I.    THE TRAFFIC STOP

Around 4:00 a.m. on 4 November 2006, RPD officers McCann and Shawn Thompson were patrolling the southeast district of Raleigh, North Carolina. (Tr. 8:6-22). Also patrolling the area in a separate vehicle was Clark. (Tr. 8:23 to 9:1). Traveling north on South East Street, McCann and Thompson observed a dark green GMC Yukon sport utility vehicle stopped at a stop sign at the intersection of Bragg Street and Bloodworth Street facing west. (Tr. 9:12-23). Instead of proceeding through the intersection in a timely manner, the SUV remained stationary until the patrol car turned off of Bloodworth Street and onto Bragg Street. (Tr. 10:1-4). As soon as the patrol car rounded the corner onto Bragg and moved in behind the SUV, the SUV turned left, heading south on Bragg Street. (Tr. 10:5-8). McCann found this behavior to be suspicious because the SUV appeared to quickly leave the area after the patrol car came within view of the SUV. (Tr. 10:9-13).

Given the behavior of the SUV, McCann radioed Clark, the other officer patrolling in the area, and described the SUV and the suspicious behavior. (Tr. 10:14-21). McCann asked Clark to "keep an eye on it." (Tr. 10:19; 60:24 to 61:13).

Within approximately five minutes after receiving the radio message from McCann, Clark encountered the SUV and began to follow it at a distance sufficient to keep it in sight. (Tr. 11:1-8;

5

61:17-20). As Clark followed the SUV, it made a left turn onto Hoke Street, another left onto Garner Road, a right turn onto East Bragg Street, and then another right turn onto Angelus Drive. (Tr. 62:20 to 63:9). These turns formed a u-shaped path rather than moving the vehicle in a single direction. (Tr. 63:21-24). Clark also observed that the SUV would accelerate rapidly at the beginning of each of the turns. (Tr. 63:13-17). Clark found this behavior suspicious because it appeared to be designed to elude him. (Tr. 63:13 to 64:9).

Angelus Drive is a road that runs through an apartment complex with parking spaces on either side of the roadway. (Tr. 64:23 to 65:5). As Clark turned onto Angelus Drive following the SUV, he observed the SUV make a three-point turn at the end of Angelus Drive and proceed back in the direction of the intersection of Angelus Drive and East Bragg Street. (Tr. 64-13-22). When the SUV proceeded in this new direction, it was moving "head on" toward Clark's patrol car. (Tr. 65:9-12 ). As the SUV came within approximately 20 to 25 feet of Clark's vehicle, Clark observed through the SUV's front windshield that the driver was not wearing a seat belt. (Tr. 65:13-24; 67:6-11). Based on his observation of the seat-belt violation, Clark initiated a traffic stop of the SUV. (Tr. 66:4-7).

Following the stop, Clark approached the SUV and asked defendant for his license and registration. (Tr. 68:12-15). Clark noted that the SUV's inspection sticker had expired. (Tr. 69:12-16). Clark observed that defendant appeared "a little bit nervous." (Tr. 69:23-24). After Clark returned to his vehicle to conduct a license and registration background check, McCann and Thompson arrived at the scene. (Tr. 70:5-13). At that point, McCann took control of the scene. (Tr. 70:16-21).

6

McCann approached the vehicle and questioned defendant about what he was doing in the neighborhood. (Tr. 12:20-22). Defendant explained that he was looking for a Hispanic female he had recently met named Angelica.[8] (Tr. 12:22-24). He further explained that he thought she lived to the west, but then later in the conversation stated that he believed she lived towards the southeast. (Tr. 12:24 to 13:5). As he was speaking with defendant, McCann observed that defendant had turned his body toward the open window of the vehicle and placed his shoulders and arms partially outside the window in an unusual manner. (Tr. 14:7-13). McCann stated that defendant's body position was awkward and unlike the manner in which most people sit in their seats during a stop. (Tr. 14:13-15). Defendant was very nervous, chatty, and chewing gum loudly. (Tr. 15:2-5). This behavior made McCann believe that defendant was trying to keep McCann's attention away from something. (Tr. 15:4-8). McCann also noticed that defendant was not wearing a seat belt. (Tr. 14:19-21).

## II.    THE SEARCH AND THE ARREST

Based on defendant's unusual and suspicious behavior, McCann asked defendant to step out of the vehicle. (Tr. 15:9-11). Defendant did not immediately comply, but asked McCann at least twice why he needed to get out before finally complying. (Tr. 15:12 to 16:3). Upon exiting the vehicle, McCann had defendant face the vehicle and place his hands on the rear passenger window while McCann performed a "pat-down" for weapons. (Tr. 16:6-11). Twice during the pat-down defendant moved his hands down toward the front of his waist and had to be instructed by McCann to put his hands back up. (Tr. 16:13-17).

---

[8] Although the fact that the name of the woman for whom defendant was purportedly looking was similar to that of the name of the street on which he was stopped could conceivably be a source of suspicion, McCann did not indicate that he drew that conclusion, and the court makes no such implication.

McCann found a folding knife in defendant's back pocket and removed it. (Tr. 17:4-12). McCann also felt what he believed to be marijuana in defendant's front left pocket and asked defendant twice if he had something in his pocket. (Tr. 17:13-21). Defendant did not respond until McCann asked him a third time if he had marijuana in his pocket, to which defendant responded, "Yes. I have some weed." (Tr. 17:19-24). When McCann removed the item from defendant's pocket, he discovered it to be a single bag with four small units of marijuana. (Tr. 17:25 to 18:4).

At that point, defendant was placed under arrest, and the search of his person was continued incident to the arrest. (Tr. 18:1-6). During this search, $2,365.00 in United States currency was found in another of defendant's pockets. (Tr. 18:6-8). Defendant was then placed in Clark's patrol vehicle. (Tr. 18:14-15). In a subsequent search of defendant's vehicle, McCann found a nine millimeter semi-automatic pistol in the center console. (Tr. 18:12-19).

## III. THE CUSTODIAL INTERVIEW

Upon completion of the vehicle search, defendant was transported to the RPD station. (Tr. 18:20-24). Upon arrival at the station, defendant was placed in an interview room. (Tr. 18:20-24; 111:13-16). Haines and McCann later entered the room together. (Tr. 112:1-4). Haines asked defendant if he was familiar with his *Miranda* rights, and he said he was. (Tr. 112:5-11). After obtaining booking information from defendant, Haines read him his *Miranda* rights from a rights form. (Tr. 112:18 to 115:12). Defendant stated that he understood his rights, but refused to sign the rights form. (Tr. 115:20-24). McCann then left the interview room at Haines' direction, and Haines proceeded with his interview of defendant regarding the events of that morning. (Tr. 118:24 to 119:2; 119:24 to 120:8).

8

Defendant, however, refused to answer questions about the marijuana and the gun, and repeatedly asserted that the stop of his vehicle was unlawful. (Tr. 120:19-24; 121:2-9). After approximately five minutes of unproductive discussion in this manner, Haines terminated the interview. (Tr. 121:10-16). Less than five minutes after Haines left the interview room, defendant began yelling out that he wanted Haines to return. (Tr. 121:20 to 122:1). Haines then returned to the interview room and continued the interview. (Tr. 122:2). Defendant subsequently admitted that he smoked marijuana on a regular basis and that he had possessed the gun for a long time, which he kept for protection. (Tr. 122:11 to 123:1).

## DISCUSSION

Defendant seeks suppression of all evidence seized from him and his vehicle as a result of the traffic stop as well as his statements to police following his arrest. He seeks suppression of the evidence seized on two grounds: (1) the police had no reasonable suspicion to stop him for driving without a seat belt because at the time of the stop he was on a private drive; and (2) Clark's testimony that he was able to observe that Adams was not wearing a seat belt was not credible. Defendant seeks suppression of the custodial statements he made following his arrest on the grounds that he did not validly waive his *Miranda* rights during his custodial interview. The court will discuss first suppression of the evidence seized from defendant and his vehicle and then suppression of the statements he made.

## I.    EVIDENCE SEIZED FROM DEFENDANT AND HIS VEHICLE

### A.    Reasonable Suspicion for Traffic Stop

A law enforcement officer may stop and briefly detain a person for "investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be

9

afoot.'"[9]  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The existence of reasonable suspicion depends on the totality of the circumstances and whether the "detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The common law has "deliberately avoided reducing [analysis of reasonable suspicion] to 'a neat set of legal rules.'" *Id.* at 274. In assessing reasonable suspicion, law enforcement officers are allowed to "draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Id.* at 273; *see also United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (describing reasonable suspicion as a "commonsensical proposition . . . crediting the practical experience of officers"). Reasonable suspicion may arise from conduct which is in and of itself legal. *United States v. Perkins*, 363 F.3d 317, 328 (4th Cir. 2004). "As long as the officer has a reasonable suspicion that even a minor traffic offense has occurred or is occurring, the stop of the vehicle is constitutionally permissible." *United States v. Williams*, 85 Fed. Appx. 341, 346 (4th Cir. 2004).

Defendant contends that Clark could not have had reasonable suspicion to stop defendant on Angelus Drive because it was a private road and the requirement to wear a seat belt applies only to public roads.[10] There appears to be no dispute between the parties that the other streets involved,

---

[9] The court notes that defendant incorrectly asserts that Clark must have had "probable cause or reasonable suspicion" to stop defendant. *See United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) ("As long as the officer has reasonable suspicion that even a minor traffic offense has occurred or is occurring, the stop of the vehicle is constitutionally permissible.").

[10] The court notes that defendant's argument that Clark lacked reasonable suspicion for the stop because Angelus Drive is a private road was raised for the first time in defendant's supplemental memorandum filed after the hearing. However, because the government had and took the opportunity to respond to this argument, the court has given it full consideration.

Bloodworth Street, Hoke Street, Garner Road, and Bragg Street, are all public streets. In support of his argument, defendant relies on the statute imposing the seat-belt requirement, N.C. Gen. Stat. § 20-135.2A(a). It provides that "each occupant of a motor vehicle . . . shall have a seat belt properly fastened about his or her body at all times when the vehicle is in forward motion *on a street or highway in this State*." N.C. Gen. Stat. § 20-135.2A(a) (emphasis added). The terms "highway" and "street" are both defined as "[t]he entire width between property or right-of-way lines of every way or place of whatever nature, when any part thereof is open to the use of the public as a matter of right for the purposes of vehicular traffic." N.C. Gen. Stat. §§ 20-4.01(13), (46). In contrast, a "private road" is defined as one "not open to the use of the public as a matter of right for the purpose of vehicular traffic." N.C. Gen. Stat. § 20-4.01(30). Defendant argues that Angelus Drive is a private road because it "serves exclusively as a circular drive around the apartments" (Def.'s Supp. Mem. 11), the street sign for Angelus Drive is marked "PRIVATE STREET" (Tr. 193:15-24), and it is not maintained by the State of North Carolina (Tr. 193:1-4).

In response to defendant's argument, the government cites to recent North Carolina case law that would support a conclusion that Angelus Drive is a "street or highway" under N.C. Gen. Stat. § 20-135.2A(a). *See State v. Hopper*, — N.C. App. —, 695 S.E.2d 801, 807 (2010). There, the North Carolina Court of Appeals held that the evidence was sufficient to support a finding that the street on which defendant was stopped for failure to have working taillights was a public street, running as it did through an apartment complex.

It is not necessary, however, to resolve the issue of whether Angelus Drive is a public or private street. Assuming *arguendo* that Angelus Drive was a private road not subject to the seat belt requirement, the court finds sufficient evidence to conclude that Clark had a reasonable suspicion

11

that defendant had operated or was about to operate his vehicle on a public road while not wearing a seat belt. Both Clark and McCann observed defendant driving on several public streets before turning onto Angelus Drive. Clark pursued defendant onto Angelus Drive and observed defendant make a three-point turn and head back in the direction of the intersection with Bragg Street. At the point that Clark observed that defendant was not wearing a seat belt, defendant's vehicle had only two possible routes after reaching the end of Angelus Drive: a right or left turn onto Bragg Street (*see* Gov.'s Hrg. Ex. 1), a public road. This evidence supports a reasonable suspicion that defendant either had been driving on public streets without a seat belt prior to turning onto Angelus Drive or was about to do so as he headed back to Bragg Street. The court agrees with the government's reasoning that "it would be irrational to conclude that defendant Adams unbuckled solely for the purpose of executing a u-turn on Angelus." (Gov.'s Supp. Mem. 17).

Because the court finds that the evidence supports a reasonable suspicion that defendant had violated and was about to again violate the State seat-belt law, it concludes that the stop of defendant's vehicle was constitutional. Accordingly, the motion to suppress on this ground should be denied.

### B.    Credibility of Clark's Testimony

The issue now becomes whether Clark's testimony that he observed Adams not wearing his seat belt was not credible. The determination of credibility rests with the trial court. "[I]t is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008). Evaluation of Clark's testimony shows it to be credible.

12

During the suppression hearing, Clark answered the questions put to him forthrightly and without evasion. He gave every indication of recounting facts as he recalled them, not advocating for one side or the other.

While Clark's actions on the night in question are admittedly in issue, any incentive he would otherwise have to lie is diminished by the fact that he is no longer with the RPD or in law enforcement at all. Rather, he presently serves as a pilot in the Army, which he joined for a second time after completing about five years of service with the RPD. (Tr. 58:21 to 59:13; 59:24-60:1). His first tour with the Army was as a Ranger prior to joining the RPD, during which he served in Iraq and Afghanistan doing intelligence work. (Tr. 59:5-23). Clark compiled a clean record while serving with the RPD. (Tr. 72:21 to 73:6). His police and military service records tend to bolster his credibility.

Further, Clark's testimony that he observed defendant not wearing a seat belt is supported by other evidence. McCann corroborated Clark's testimony that the area where the stop occurred was well lit from both lighting on the apartment buildings that face the parking area and street lights. (Tr. 12:9-17; 64:23 to 65:8). In fact, the aerial view of the area shows that one of the street lights was directly over the area where the traffic stop occurred. (*See* Def.'s Exs. 25a, 25b, 25c; Tr. 104:9 to 105:6; 153:25 to 154:18). There was also nearly a full moon to add to the available light. (*See* D.E. 84 ¶¶ 1, 3). Clark's testimony that the windshield on the SUV, through which Clark saw defendant, was untinted (Tr. 69:2-11), was corroborated by Flowers, defendant's own witness (Tr. 151:23-24).

In addition, Clark's account of the location of his car in relation to the SUV is consistent with his being able to see whether defendant was wearing a seat belt. Specifically, Clark testified that his

13

patrol car was facing defendant's vehicle and was located approximately 20 to 25 feet away when he saw that defendant was not wearing a seat belt. (Tr. 65:18-24; 67:6-11; 69:2-4). McCann corroborated that when he arrived at the scene after the stop, the two vehicles were facing each other and were approximately 15 to 30 feet apart. (Tr. 19:3-17).

Nevertheless, defendant contends that several factors undermine the credibility of Clark's testimony: the angle of the SUV's headlights, the lower profile of the patrol car, the unwashed state of Clark's windshield, Clark's possible fatigue after being on patrol for seven hours, and the tan color of the seat belt against the tan-colored shirt worn by defendant. The court finds none of these points, most of which are speculative in nature, to be persuasive.

In support of his argument, defendant engaged Flowers to demonstrate that the actual conditions on the night of the stop would have prevented Clark from observing the absence of a seat belt. Accordingly, on 14 July 2010, Flowers attempted to conduct a simulation of the traffic stop with an SUV and a compact car in the same area during the same early morning hours. (Tr. 153:15 to 162:2). The attempted simulation was recorded by video and photographs. (Tr. 162:2 to 172:3).

The court gives little weight to this simulation for several reasons. First, as defendant admits, Flowers conducted the simulation at the wrong location (Tr. 173:13 to 174:9), which, unlike the correct location, did not have street lights in the immediate area. (Def.'s Hrg. Ex. 25a, 25b; Tr. 180:15 to 183:12). Also, while there was nearly a full moon on the night of the traffic stop, there was no moon in the sky at the time of the simulation. (*See* D.E. 84 ¶¶ 1-3).

Not only were the conditions at the time of the simulation too dissimilar to make any reasonable comparison, the video and photographic evidence is also of little value. Flowers admitted that she has no specialized training in photography. (Tr. 186:16 to 188:20). Moreover, the court's

14

own review of the video and photographic evidence establishes that it does not portray nighttime as it naturally appears, but instead shows it to be substantially darker than in real life.

Finally, defendant seeks to challenge Clark's credibility on the basis of allegedly inconsistent statements he made at defendant's trial. The court finds these challenges to be without merit.

First, defendant says that while Clark testified at trial to the presence of street lights at only the traffic stop area, he testified at the suppression hearing that there was also lighting on the apartment buildings. As the government correctly notes, however, the legality of the traffic stop was not before the court or jury at trial. Thus, Clark's provision of the additional details regarding the lighting in the area, a point that is highly relevant to the issues raised by the suppression motion, does not create an inconsistency.

The court also rejects defendant's assertion that Clark's testimony was inconsistent regarding the distance between his patrol car and defendant's SUV when he observed the seat-belt violation. At the suppression hearing, Clark testified that he was approximately 20 to 25 feet away when he made the observation. At trial, Clark testified as follows:

> Q.   Okay. And then at some point did he actually turn around?
>
> A.   He did.  He made a U-turn in front of me.
>
> Q.   And how far away from you was he when he did that?
>
> A.   I'd say 30 feet at the most.
>
> Q.   Okay, what happened when he made that turn?
>
> A.   I noticed that he wasn't wearing a seat belt and I conducted a traffic stop.

(Def.'s Hrg Ex. 22 at 37:17-23).

While this testimony does appear to place Clark closer to defendant's SUV when defendant made the u-turn than Clark's hearing testimony, the distance at which Clark testified he observed the absence of a seat belt, about 30 feet, is substantially the same. It is this distance that is the more material in this matter and it is on this point that Clark was consistent. Clark clarified at the suppression hearing that the u-turn occurred at approximately 300 feet and that he noticed the driver not wearing a seat belt at a distance of a little less than 30 feet. (Tr. 88:17 to 89:14). This clarification is consistent with the other testimony and evidence, including the maps, that describe the circumstances of the stop.

For the foregoing reasons, the court concludes that Clark's testimony that he observed defendant not wearing a seat belt is credible. Thus, the second ground advanced by defendant for suppression of the evidence seized, like the first, is without merit. The portion of the motion seeking suppression of such evidence should therefore be denied.

## II.    DEFENDANT'S CUSTODIAL STATEMENTS

As indicated, defendant seeks to have the statements he made while in custody suppressed on the ground that they were obtained in violation of his right against self-incrimination under *Miranda*. The court will first review the legal principles applicable to this portion of defendant's motion and then turn to their application to the facts presented in this case.

### A.    Fifth Amendment Rights under *Miranda*

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To protect this right, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966) established rules governing custodial interrogations. 384 U.S. at 479. *Miranda* requires that, prior to questioning, a suspect who is in

16

custody must be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* Questioning may proceed only if the person lawfully waives his rights. *Id.*

*Miranda* conditions the admissibility at trial of any custodial statements on compliance with the warning procedure. *Id.* "'[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.'" *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005) (quoting *Missouri v. Seibert*, 542 U.S. 600, 608 (2004)). The exclusion applies to the government's case-in-chief, but not necessarily other uses. *United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006) (citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[T]he *Miranda* presumption [of compelled testimony], though irrebuttable for purposes of the prosecution's case-in-chief, does not require that the statements and their fruits be discarded as inherently tainted.")).[11] Because the remedy of exclusion is available to a defendant in any criminal trial regardless of whether the violation is committed by federal, state, or local officials, it is available to a defendant in a federal criminal case although the alleged violation was by state or local law enforcement, as here. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (noting that the exclusion remedy applies to "any subsequent criminal trial"); *see also* U.S. Const. amend. V (providing a right against self-incrimination in "any criminal case").

The inquiry into the validity of a waiver has two distinct elements. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The court must determine both whether it was voluntary and whether it was

---

[11] The scope of the exclusion remedy for *Miranda* violations is therefore not as broad as the exclusionary rule for Fourth Amendment violations, which precludes the use of both the direct and indirect products of an unlawful search (*i.e.*, the "fruit of the poisonous tree" doctrine enunciated in *Wong Sun v. United States*, 371 U.S. 471 (1963)). *Elstad*, 470 U.S. at 306-07.

knowing and intelligent. *Id.* This determination is to be made based on the "'totality of the circumstances surrounding the interrogation.'" *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The government has the burden of proving the existence of both elements by a preponderance of the evidence, *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005), and "that burden is a heavy one, requiring convincing evidence," *United States v. Grant*, 549 F.2d 942, 946 (4th Cir. 1977), *vacated on other grounds sub nom. Whitehead v. United States*, 435 U.S. 912 (1978).

To be considered voluntary, a waiver must be "'the product of a free and deliberate choice rather than intimidation, coercion, or deception' on the part of the police." *Poyner v. Murray*, 964 F.2d 1404, 1413 (4th Cir. 1992) (quoting *Moran*, 475 U.S. at 421). The crucial test for determining if the waiver is voluntary "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Braxton*, 112 F.3d 777, 780-81 (4th Cir. 1997) (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). In order to be considered involuntary under this test, there must have been "'coercive police activity.'" *Id.* at 780 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). The reason is that the Fifth Amendment, on which *Miranda* was based, is concerned solely with governmental coercion, and not moral and psychological pressures to confess from other sources. *Connelly*, 479 U.S. at 170. In examining the voluntariness element, the court "'must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.'" *Id.* at 781 (quoting *Pelton*, 835 F. 2d at 1071) (internal quotations omitted).

To be knowing and intelligent, the waiver must have been made "'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"

18

*United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005) (quoting *Moran*, 475 U.S. at 421). But "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citing *Moran*, 475 U.S. at 422). It is sufficient if he "knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*, 479 U.S. at 574; *see also Moran,* 475 U.S. at 422-23.

"Whether a waiver of the right to counsel was knowing and intelligent is determined by an examination of the totality of the circumstances surrounding the waiver." *Poyner*, 964 F.2d at 1413. The relevant factors include "the suspect's intelligence and education, age and familiarity with the criminal justice system, [and] the proximity of the waiver to the giving of the *Miranda* warnings . . ." *Id.* (internal citations omitted); *see also United States v. Simmons*, 526 F. Supp. 2d 557, 565 (E.D.N.C. 2007).

## B. Alleged Violations of Defendant's *Miranda* Rights

Defendant contends that the totality of the circumstances shows that defendant did not voluntarily or knowingly and understandingly waive his *Miranda* rights during his interview by Haines and that the statements he made should accordingly be suppressed. The court disagrees.

One circumstance upon which defendant relies is his refusal to sign a *Miranda* waiver form when Haines presented it to him for signature. (Tr. 121, 129). But as defendant himself candidly acknowledges, the refusal to sign a *Miranda* waiver does not compromise the validity of an effective oral waiver. *United States v. Thompson*, 417 F.2d 196, 197 (4th Cir. 1969); *United States v. Nguyen*, 313 F. Supp. 2d 579, 588 (E.D. Va. 2004).

19

Other evidence of record tends to show a valid oral waiver. Haines discussed defendant's *Miranda* rights with him two times before defendant made his inculpatory statements. The first time was when Haines entered the interview room with McCann. (Tr. 112). The second time was briefly after that when Haines read defendant his rights from the RPD advice of rights form. *Id.* 113; (*see* Govt. Ex. 2). Defendant responded to the reading of his rights by stating that he understood them. (Tr. 112). A short time later, defendant went ahead and answered questions from Haines. Responding to questions, as defendant did, after receiving *Miranda* warnings can constitute an implicit waiver of *Miranda* rights. *United States v. Campbell*, 433 F.3d 378, 389-90 (4th Cir. 2005); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (holding that statements after *Miranda* warnings are given will rarely be found involuntary).

Moreover, defendant made his statements after he re-initiated the interview. As previously discussed, the interview stopped about five minutes after it started when Haines left the room frustrated that defendant would not discuss the case. (Tr. 121:10-16). About five minutes after Haines left, defendant called for him to return. (Tr. 121:20 to 122:1). Defendant's decision to himself cause resumption of the interview further evinces that he made a voluntary, and knowing and understanding waiver of his *Miranda* rights.

A second fact defendant points to as showing absence of a valid waiver is his dropping his initial refusal to answer any questions about the case based on his insistence that the stop and search of his vehicle were illegal. The apparent rationale is that his will must have been overcome for him to have changed course and later spoken about the case.

Surely, though, a change in the willingness of a suspect to discuss a case does not itself evidence lack of voluntariness or understanding. There can be innumerable valid reasons for a

20

change in a suspect's willingness to discuss a case, including a change in his view of the case, the hope for a more favorable outcome, a wish simply to have the process move forward, and others. If it were a requirement for a valid waiver that a suspect be willing at the outset of an interview to discuss a case, the utility of interview would undoubtedly be severely reduced. Moreover, as discussed, defendant's willingness to speak came after he re-initiated contact with Haines, essentially choosing to resume the interview.

Further, the implication of defendant's argument that by discussing the contraband in his vehicle defendant was abandoning his objection to the stop and search is baseless. Indeed, by his motion, defendant continues to rely on his objections to the stop and search despite having made statements about the contraband.

A third argument advanced by defendant is that he was not given another *Miranda* warning when the interview resumed upon Haines' return to the interview room. As the government points out, however, "the mere passage of time . . . does not compromise a *Miranda* warning." *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir. 1996); *see also United States v. Gordon*, 895 F.2d 932, 938 (4th Cir. 1990). Further, the delay here between the receipt of *Miranda* warnings and the resumption of the interview was relatively brief, about ten minutes. *(See* Tr. 121:9 to 122:1); *Frankson*, 83 F.3d at 83 (holding that passage of two and a half hours between *Miranda* warnings and interrogation did not vitiate warnings).

A fourth ground upon which defendant attacks the legality of the waiver is that Haines' testimony supporting it lack credibility. The attack fails. The court finds that Haines' testimony relating to the *Miranda* waiver issue to be credible.

21

For example, defendant contends that it is suspect that the interview of defendant was not recorded. But Haines credibly testified that RPD policy at the time barred recording an interview in a non-capital case such as this. (Tr. 133:14 to 134:14). In addition, Haines' credibility is not undermined by his having McCann leave the interview room before he began questioning defendant. As Haines explained at the hearing, his objective was to build rapport with defendant without the possibility of being interrupted by McCann, whom he did not know well and who was in a uniform. (Tr. 119:3-18).

The court also finds of no moment Haines' decision not to request a written confession from defendant. After all, defendant was not willing to sign even a *Miranda* waiver; it could reasonably be assumed that he would not write out or sign a confession.

Defendant also contends that none of the other officers who were involved corroborated Haines' testimony that defendant called to him. Defendant cites no evidence of record for this proposition, and its evidentiary basis is otherwise unclear. In any event, if it were true, it does not show Haines' testimony to be unworthy of belief. To the contrary, defendant's calling out helps explain why Haines returned to the interview room when he did. Defendant's calling out is also consistent with the new-found willingness to discuss the case defendant manifested after he returned.

The court also notes that Haines has no history of fabricating testimony. (Tr. 138:8-22). Indeed, one judge of this court commended him for his providing testimony in a case that tended to exonerate the defendant. (Tr. 138:8-22). Haines' demeanor at the hearing conveyed trustworthiness; he was neither evasive nor argumentative, but matter of fact.

In addition to the circumstances already discussed, there are several others tending to show that defendant's waiver was valid. For example, there is no evidence here of physical or mental

22

abuse of defendant, nor any contention or evidence that defendant lacked the mental capacity to make a valid waiver. He also never requested counsel, meaning there is no issue of the interview impermissibly continuing after assertion of such a request. Moreover, defendant had extensive experience with the criminal justice system prior to the interview.

For this and the other reasons stated, the court finds by a preponderance of the evidence that defendant voluntarily, and knowingly and understandingly waived his *Miranda* rights. The portion of his motion seeking suppression of his custodial statements should accordingly be denied.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress (D.E. 16) be DENIED and that the evidentiary exhibits (D.E. 94-1, -2, and -3) submitted by the government with its supplemental memorandum be STRICKEN.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 8 day of October 2010.

James E. Gates
United States Magistrate Judge

23